## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| HARVEY LIND, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>v.<br><br>BLUEBIRD BIO, INC., JEFFERY WALSH and NICK LESCHLY,<br><br>                Defendants. | Case No.  18-cv-12556<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Harvey Lind ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding bluebird bio, Inc. ("bluebird" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION AND OVERVIEW**

1.      This is a federal securities class action on behalf of all persons and entities who purchased or otherwise acquired bluebird securities between December 11, 2017, and November 29, 2018, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      The Company is a clinical-stage biotechnology company committed to developing potentially transformative gene therapies for severe genetic diseases and cancer.

3.      The Company is primarily focused on the treatment of sickle cell disease ("SCD"). SCD is a serious, progressively debilitating and life-threatening genetic disease that results from production of abnormal sickle hemoglobin ("HbS"), which leads to sickled red blood cells ("RBCs") and hemolysis. As a result of this abnormal hemoglobin, many affected individuals live with severe anemia and vaso-occlusive events which include severe, recurrent pain crises that lead to organ damage and shortened life span.

4.      The Company is conducting five clinical studies of its LentiGlobin product candidate, designed to treat SCD, with the stated goal of filing for regulatory approval in the US and EU for different genotypes of TDT and for severe SCD.  The Company's five studies are: (i) a Phase I/II study in the United States, Australia, and Thailand to evaluate its safety and efficacy in the treatment of subjects with TDT, called the Northstar Study (HGB-204); (ii) a multi-site, international, Phase III study to evaluate its safety and efficacy in the treatment of subjects with TDT and a non-$\beta^0/\beta^0$ genotype, called the Northstar-2 Study (HGB-207); (iii) a multi-site, international, Phase III study for the treatment of subjects with TDT and a $\beta^0/\beta^0$ genotype, called the Northstar 3 Study (HGB-212);  (iv) a single-center Phase I/II study in

France to evaluate its safety and efficacy in the treatment of subjects with TDT or with severe SCD (HGB-205); and (v) a multi-site Phase I study in the United States to evaluate its safety and efficacy in the treatment of subjects with severe SCD (HGB-206).

5.      Following treatment with LentiGlobin in the Northstar studies, patients are monitored for production of HbA$^{T87Q}$, which is gene therapy derived-hemoglobin. The production of HbA$^{T87Q}$ increases the overall hemoglobin level in patients with the goal of reducing or eliminating the need for transfusions.

6.      Throughout the Class Period, the Company stated that its various LentiGlobin studies, including HGB-205, would form the basis of its regulatory approval applications.

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) LentiGlobin when used to treat severe SCD did not produce as much anti-sickling hemoglobin as the Company had previously reported; (ii) accordingly, the Company's LentiGlobin product was not as effective as previously reported; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.      On Sunday, December 1, 2018, bluebird issued a press release advising investors that it had "announced new long-term data from the completed Phase 1/2 Northstar (HGB-204) study of investigational LentiGlobin™ gene therapy in patients with transfusion-dependent β-thalassemia (TDT) and from the ongoing Phase 1/2 HGB-206 study of LentiGlobin in patients with sickle cell disease (SCD) today at the 60th Annual Meeting of the American Society of Hematology (ASH)."

6.     On December 3, 2018, *Seeking Alpha* published an article noting that these "results were lower than initial data reported a year ago indicating a lower rate of production of anti-sickling hemoglobin."

7.     Following bluebird's announcement of the clinical studies' results, the Company's stock price fell $6.39 per share, or 5.2%, to close at $116.50 per share on December 3, 2018.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b).  bluebird's principal executive office is located within this Judicial District.

12.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

13.     Plaintiff, as set forth in the attached Certification, acquired bluebird securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.     Defendant bluebird is a Delaware corporation with its principal executive offices located at 60 Binney Street, Cambridge, Massachusetts. bluebird's common stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "BLUE."

15.     Defendant Nick Leschly serves as Chief Executive Officer ("CEO") of bluebird.

16.     Defendant Jeffery Walsh serves as the Chief Financial Officer ("CFO") of bluebird.

17.     The Defendants referenced above in ¶¶ 15-16 are sometimes referred to herein collectively as the "Individual Defendants."

18.     The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

19.    The Company is a clinical-stage biotechnology company committed to developing potentially transformative gene therapies for severe genetic diseases and cancer.

20.    The Company is primarily focused on the treatment of sickle cell disease. SCD is a serious, progressively debilitating and life-threatening genetic disease. SCD results from production of abnormal sickle hemoglobin, which leads to sickled red blood cells and hemolysis. As a result of this abnormal hemoglobin, many affected individuals live with severe anemia and vaso-occlusive events which include severe, recurrent pain crises that lead to organ damage and shortened life span.

21.    The Company is conducting five clinical studies of its LentiGlobin product candidate, designed to treat Sickle Cell Disease, with the state goal of filing for regulatory approval in the US and EU for different genotypes of TDT and for severe SCD.  The Company's five studies are: (i) a Phase I/II study in the United States, Australia, and Thailand to evaluate its safety and efficacy in the treatment of subjects with TDT, called the Northstar Study (HGB-204); (ii) a multi-site, international, Phase III study to evaluate its safety and efficacy in the treatment of subjects with TDT and a non-$\beta^0/\beta^0$ genotype, called the Northstar-2 Study (HGB-207); (iii) a multi-site, international, Phase III study for the treatment of subjects with TDT and a $\beta^0/\beta^0$ genotype, called the Northstar 3 Study (HGB-212);  (iv) a single-center Phase I/II study in France to evaluate its safety and efficacy in the treatment of subjects with TDT or with severe SCD (HGB-205); and (v) a multi-site Phase I study in the United States to evaluate its safety and efficacy in the treatment of subjects with severe SCD (HGB-206).

22.    Following treatment with LentiGlobin in the Northstar studies, patients are monitored for production of $HbA^{T87Q}$, which is gene therapy derived-hemoglobin. The

production of HbA$^{T87Q}$ increases the overall hemoglobin level in patients with the goal of reducing or eliminating the need for transfusions.

## Materially False and Misleading Statements Issued During the Class Period

23.     The Class Period begins on December 11, 2017, when the Company issued a press release announcing "Updated Data from HGB-205 Study of LentiGlobin™ Gene Therapy in Patients with Severe Sickle Cell Disease and Transfusion-Dependent β-Thalassemia[.]" The press release contained the findings which were presented that same day in a poster session at the 59th Annual Meeting of the American Society of Hematology ("ASH").

24.     In particular, the Company reported the following data from the study:

HGB-205 is an ongoing, open-label, single-center Phase 1/2 study designed to evaluate the safety and efficacy of LentiGlobin drug product (DP) in the treatment of patients with severe SCD and TDT. The study enrolled three patients with severe SCD and four patients with TDT, who have undergone infusion with LentiGlobin DP. Results as of September 20, 2017 include:

**SCD**:

- All three treated patients showed rising HbA$^{T87Q}$ levels in the first six months.
- Patient 1204 was 13 years old at study enrollment. At last follow-up (35.2 months), this patient had a total hemoglobin of 12.4 g/dL, of which 6.1 g/dL was HbA$^{T87Q}$ (52 percent anti-sickling Hb). HbA$^{T87Q}$ concentration in this patient has remained stable since approximately nine months post-infusion. The patient continues to show marked clinical improvement.
- Patient 1207 was 16 years old at study enrollment. At last follow-up (8.9 months), this patient had a total hemoglobin of 10.0 g/dl, of which 0.7 g/dl was HbA$^{T87Q}$ (14 percent anti-sickling Hb). This patient had a pre-treatment history of frequent episodes of vaso-occlusive crisis (VOC) and acute chest syndrome (ACS) despite hydroxyurea prior to beginning regular transfusions. Patient 1207 had episodes of ACS and hospitalization at six and eight months post-treatment, and received three transfusions.
- Patient 1208 was 21 years old at study enrollment. At last follow-up (6.0 months), this patient had a total hemoglobin of 10.6 g/dL, of which 2.7 g/dL was HbA$^{T87Q}$ (46 percent total anti-sickling Hb). This patient had a pre-treatment history of frequent episodes of VOCs and ACS prior to beginning regular transfusions, and was still symptomatic while receiving regular transfusions. Following LentiGlobin treatment, Patient 1208 has had no episodes of VOCs or ACS (with six months follow-up).

**TDT**:

- All four patients with TDT have remained free of chronic transfusions since shortly after receiving LentiGlobin DP.
- Patient 1201 (β0/βE genotype) has been free of transfusions for 45.2 months with total hemoglobin of 10.1 g/dL, of which 6.7 g/dL was HbA$^{T87Q}$.
- Patient 1202 (β0/βE genotype) has been free of transfusions for 40.1 months with total hemoglobin of 12.9 g/dL, of which 10.1 g/dL was HbA$^{T87Q}$.
- Patient 1206 (β0/βE genotype) has been free of transfusions for 23.8 months with total hemoglobin of 11.1 g/dL, of which 8.0 g/dL was HbA$^{T87Q}$.
- Patient 1203, who is homozygous for the severe β+ mutation IVS1-110, has been free of transfusions for 20.9 months with total hemoglobin of 8.7 g/dL, of which 6.7 g/dL was HbA$^{T87Q}$.
- Three of four patients (1201, 1202 and 1206) were able to begin therapeutic phlebotomy. Patient 1202 subsequently discontinued iron chelation and phlebotomy.
- The safety profile of LentiGlobin DP continues to be consistent with myeloablative conditioning with single-agent busulfan. No DP-related adverse events have been observed, and there is no evidence of clonal dominance.

25.     The press release included positive statements by Dave Davidson, M.D., chief medical officer, bluebird bio, where he touted the observed results of the study comprised of only seven individuals (sometimes referred to as "Group A"), stating in relevant part:

People with SCD and TDT experience serious complications and organ damage as a result of their disease and complications from chronic blood transfusions. Addressing the underlying genetic causes of these diseases has the potential to dramatically improve patient outcomes. . . . All three patients with severe SCD in the HGB-205 study showed a steady increase in HbAT87Q production in the first six months following LentiGlobin therapy, with the longest-treated patient showing stable hemoglobin levels over two and a half years. All four patients with TDT are transfusion-free following therapy, up to almost four years in the first patient treated. The durable treatment effects observed to date in this study are encouraging, particularly given the manufacturing process improvements that we implemented across our subsequent clinical studies of LentiGlobin, and additional changes to the HGB-206 study protocol that we hope will further improve outcomes for patients with SCD.

26.    The press release also contained a statement by Marina Cavazzana, M.D., Ph.D.,

the primary investigator of the HGB-205 study, touting the results thus far of the Northstar trial:

> All seven patients in this study continue to experience notable clinical
> improvement. Since being treated with LentiGlobin therapy, the four patients with
> TDT have been free of chronic transfusions with near normal and stable levels of
> total hemoglobin," said Professor Cavazzana. "While progress has been made
> with medications to treat SCD and TDT, we are in need of better options for our
> patients. This study suggests that LentiGlobin has the potential to be a
> transformational one-time therapy for people with SCD and TDT

27.    The Company's December 11, 2017 press release was also attached as Exhibit

99.4 to a Form 8-K filed with the SEC that same day.

28.    The Company also published on its website its slideshow presented at the 59th

Annual Meeting of the ASH, which stated that the Company's "TDT Registration Strategy" with

respect to the EU was to "[p]ursue CONDITIONAL APPROVAL in patients with non-

$\beta^0/\beta^0$ genotypes on the basis of data from ongoing Northstar (HGB-204) & HGB-205 studies, as

well as available data from Northstar-2 (HGB-207) study." (Emphasis in original).

29.    On February 21, 2018, the Company filed its annual report on Form 10-K for the

fiscal year ended December 31, 2017 (the "2017 10-K") with the SEC, which contained signed

certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by the Individual

Defendants, attesting to the accuracy of financial reporting, the disclosure of any material

changes to the Company's internal controls over financial reporting, and the disclosure of all

fraud.

30.    The 2017 10-K notes that the Company "presented clinical data from [its]

Northstar Study, Northstar 2 Study and [its] HGB-205 study at the ASH Annual Meeting in

December 2017."

31.     The 2017 10-K further provided the following "Updated Clinical Data for

the LentiGlobin product candidate in subjects with TDT or severe SCD":

*Updated clinical data from the Northstar Study in subjects with TDT*

In December 2017, we presented updated clinical data from our Northstar Study
at the ASH Annual Meeting. All data presented at ASH Annual Meeting and
summarized below from our Northstar Study are as of the data cut-off date of
September 21, 2017. As of the data cut-off date, ten subjects with non-$\beta0/\beta0$
genotypes and eight subjects with $\beta0/\beta0$ genotypes have undergone infusion with
LentiGlobin drug product in our Northstar Study.

For the 18 subjects, the median LentiGlobin drug product vector copy number
was 0.7 (min. max: 0.3-1.5) copies per diploid genome, the median cell dose was
8.1 (range: 5.2-18.1) x 106 CD34+ cells/kg, and the proportion of transduced
CD34+ cells was 17 to 58 percent. Vector copy number, or VCN, is a
measurement of the mean number of viral vectors in a population of cells, or
vector copies per diploid genome.

As of the data cut-off date, all 18 subjects have $\geq$18 months follow up, with ten
having completed the two-year follow up analysis. Three subjects have had three
years of follow up, for a median of 27.4 (range: 17.5-36.5) months of follow up.

Nine of ten subjects with non-$\beta0/\beta0$ genotypes were free from chronic
transfusions, for a median of 29 (range: 14.7-33.1) months. These nine subjects
had HbAT87Q concentrations of 3.6-9.3 (g/dL). The one subject with a non-
$\beta0/\beta0$ genotype who still required periodic transfusions was treated with
LentiGlobin drug product having a VCN in the lower range (0.3 copies per
diploid genome).

Two of eight subjects with $\beta0/\beta0$ genotypes have not received a transfusion in
more than a year (16.7 months and 15.7 months). At the subjects' last study visits
(Month 36 and Month 18, respectively), total hemoglobin levels were 10.2 and
10.3 g/dL and HbAT87Q levels were 9.7 and 7.0 g/dL, respectively. Clinically
meaningful reductions in transfusion volume and frequency were observed in
five of the six subjects with $\beta0/\beta0$ genotypes who have continued to receive
transfusions.

The safety profile of LentiGlobin drug product continues to be consistent with
myeloablative conditioning with single-agent busulfan. No Grade 3 or higher
drug product-related adverse events have been observed. All subjects remain
enrolled in the study and there have been no reports of graft versus host disease.

It should be noted that these data presented above are current as of the data cut-
off date, are preliminary in nature and our Northstar Study is not complete. There
is limited data concerning long-term safety and efficacy following treatment with
our LentiGlobin product candidate. These data may not continue for these

subjects or be repeated or observed in ongoing or future studies involving our LentiGlobin product candidate in subjects with TDT, including this study, our HGB-205 study, our Northstar-2 Study, or our Northstar-3 Study. It is possible that subjects for whom transfusion support has been reduced or eliminated may receive transfusion support in the future.

*Updated clinical data from the Northstar-2 Study in subjects with TDT and a non-β0/β0 genotype*

In December 2017, we presented updated clinical data from our Northstar-2 Study at the ASH Annual Meeting. As of December 1, 2017, drug product had been manufactured for ten subjects, using our updated refined drug product manufacturing process. The median LentiGlobin drug product VCN for these subjects was 3.3 (range: 2.4-5.4) copies per diploid genome.

As of October 13, 2017, seven subjects, with ages of 15-24 years, had been infused with LentiGlobin drug product. The median follow-up period was 3 (range 1-9) months. Three subjects who had ≥6 months of follow-up as of October 13, 2017 are transfusion-free, and of the three subjects, two have achieved or are approaching a normal total hemoglobin level (up to 12.5 g/dL total Hb; range in three subjects: 8.4 – 12.5 g/dL) without transfusions (up to 10.2 g/dL vector-derived HbAT87Q). Five of six subjects treated in the study with ≥3 months of follow-up available as of December 1, 2017 are making at least 6 g/dL of HbAT87Q.

The safety profile of LentiGlobin drug product to date is similar to that observed in the Northstar Study, and consistent with myeloablative conditioning with single-agent busulfan. No drug product-related adverse events have been observed. All subjects remain enrolled in the study and there have been no reports of graft versus host disease.

It should be noted that these data presented above are current as of the data cut-off date, are preliminary in nature and our Northstar Study-2 is not complete. There is limited data concerning long-term safety and efficacy following treatment with our LentiGlobin product candidate. These data may not continue for these subjects or be repeated or observed in ongoing or future studies involving our LentiGlobin product candidate in subjects with TDT, including this study, our Northstar Study, or our Northstar-3 Study, or our HGB-205 study. It is possible that subjects for whom transfusion support has been reduced or eliminated may receive transfusion support in the future.

*Updated clinical data from the HGB-205 study in subjects with TDT or severe SCD*

In December 2017, we presented updated clinical data from our HGB-205 study in subjects with SCD or TDT at the ASH Annual Meeting. All data presented at the ASH Annual Meeting and summarized below from our HGB-205 study are

as of the data cut-off date of September 20, 2017. As of the data cut-off date, the study had enrolled three subjects with severe SCD and four subjects with TDT.

All three subjects with severe SCD were infused with LentiGlobin drug product and showed rising HbAT87Q in the first six months following infusion. Subject 1204 was 13 years old at study enrollment. At 30 months post-drug product infusion, this subject had a total hemoglobin level of 12.4 g/dL, of which 6.1 g/dL was HbAT87Q and 52 percent was anti-sickling hemoglobin. HbAT87Q concentration in this subject has remained stable since approximately nine months post-infusion. The subject continues to show marked clinical improvement. Subject 1207 was 16 years old at study enrollment. At 9 months following drug product infusion, this subject had a total hemoglobin of 10.0 g/dL, of which 0.7 g/dL was HbAT87Q and 14 percent was anti-sickling hemoglobin). This subject had a pre-treatment history of frequent episodes of vaso-occlusive crisis (VOC) and acute chest syndrome (ACS) despite hydroxyurea prior to beginning regular transfusions. Subject 1207 had episodes of ACS and hospitalization at six and eight months post-treatment, and was treated with exchange transfusions.   Subject 1208 was 21 years old at study enrollment. At last follow-up (6.0 months), this subject had a total hemoglobin of 10.6 g/dL, of which 2.7 g/dL was HbAT87Q and 46 percent was anti-sickling hemoglobin). This subject had a pre-treatment history of frequent episodes of VOCs and ACS prior to beginning regular transfusions, and was still symptomatic while receiving regular transfusions. Following LentiGlobin treatment, Subject 1208 has had no episodes of VOCs or ACS (with six months follow-up).

All four subjects with TDT have remained free of chronic transfusions since shortly after receiving LentiGlobin drug product. Subject 1201 (β0/βE genotype) has been free of transfusions for 45.2 months with total hemoglobin of 10.1 g/dL at month 42, of which 6.7 g/dL was HbAT87Q. Subject 1202 (β0/βE genotype) has been free of transfusions for 40.1 months with total hemoglobin of 12.9 g/dLat month 42, of which 10.1 g/dL was HbAT87Q. Subject 1206 (β0/βE genotype) has been free of transfusions for 23.8 months with total hemoglobin of 11.1 g/dL at month 21, of which 8.0 g/dL was HbAT87Q. Subject 1203, who is homozygous for the severe β+ mutation IVS1-110, has been free of transfusions for 20.9 months with total hemoglobin of 8.7 g/dL at month 24, of which 6.7 g/dL was HbAT87Q. Three of four subjects (1201, 1202 and 1206) were able to begin therapeutic phlebotomy. Subject 1202 subsequently discontinued iron chelation and phlebotomy.

The safety profile of LentiGlobin drug product continues to be consistent with myeloablative conditioning with single-agent busulfan. No drug-product related adverse events have been observed.

It should be noted that these data presented above are current as of the data cut-off date, are preliminary in nature and our HGB-205 study is not complete. There is limited data concerning long-term safety and efficacy following treatment with our LentiGlobin product candidate. These data may not continue for these

subjects or be repeated or observed in ongoing or future studies involving our LentiGlobin product candidate in subjects with TDT or SCD, including this study, our Northstar Study, our Northstar-2 Study, or our Northstar-3 Study. It is possible that subjects for whom transfusion support has been reduced or eliminated may receive transfusion support in the future. Furthermore, the LentiGlobin drug product used for the HGB-205 study is manufactured at the clinical trial site in Paris, and is not manufactured at our third-party manufacturing locations, and does not use our updated drug product manufacturing process that is being utilized in our Northstar-2 Study.

*Updated clinical data from the HGB-206 study in subjects with severe SCD*

Also in December 2017 at the ASH Annual Meeting, we presented updated clinical data from our HGB-206 study of subjects with severe SCD. All data presented at the ASH Annual Meeting and summarized below from our HGB-206 study are as of the data cut-off date of October 26, 2017 for Group A and November 30, 2017 for Group B. Subjects in this study are divided into three cohorts: A, B and C. Subjects in Group A were treated under the original study protocol. Subjects in Group B were treated under an amended study protocol that included changes intended to increase drug product VCN and to improve engraftment of gene-modified stem cells. Subjects in both Group A and B had drug product made from stem cells collected using bone marrow harvest. Subjects in Group C are also treated under the amended study protocol, but received LentiGlobin made from stem cells collected from peripheral blood after mobilization with plerixafor, rather than via bone marrow harvest. As of the data cut-off date, ten subjects had been treated in the study and follow-up data were available on nine subjects from groups A and B, with a median of 21 (6-27) months since transplantation. The updated clinical data from our HGB-206 study presented at the ASH Annual Meeting are summarized below.

| | Group A N=7 Median (min-max) | Group B N=2 | |
| --- | --- | --- | --- |
| | | Subject 1312 | Subject 1313 |
| Transduced CD34+ cells (%) | 25 (8-42) | 95[1], 90[1] | 46, 83[1] |
| Drug product Cell Dose (x10⁶ CD34+ cells) | 2.1 (1.6-5.1) | 3.2 | 2.2 |
| Drug product VCN (copies per diploid genome) | 0.6 (0.3-1.3) | 2.9[1], 5.0[1] | 1.4, 3.3[1] |
| VCN in peripheral blood (copies per diploid genome at last measurement) | 0.1 (0.1-0.2) | 2.5 (month 6) | 0.5 (month 9) |
| HbA$^{T87Q}$ (g/dL at last measurement) | 0.7 (0.5-2.0) | 6.4 (month 6) | 3.0 (month 9) |
| HbA$^{T87Q}$ (% of total, at last measurement) | 7.9 (5.3-18.2) | 51% (month 6) | 28% (month 9) |

[1]   LentiGlobin drug product manufactured using refined process. Both subjects in Group B received drug product from two manufacturing lots. Data regarding each of these LentiGlobin drug product lots for these two subjects are reflected in the table above. Further, Subject 1313 received LentiGlobin drug product manufactured using a combination of the original and the updated manufacturing process. Subject 1312 received LentiGlobin drug product manufactured entirely using the updated manufacturing process.

As of November 30, 2017, LentiGlobin drug product has been manufactured for four subjects enrolled in Group C of this study, for which the median transduced CD34+ cells was 80 percent, the median drug product cell dose was 6.9 x10⁶ CD34+ cells, and the median drug product VCN was 3.3 copies per diploid genome. The first subject treated with LentiGlobin in Group C of this study had

VCN of 2.5 copies per diploid genome in peripheral blood one month following infusion.

The safety profile of LentiGlobin drug product observed from drug product infusion to latest follow-up was generally consistent with myeloablative conditioning with single-agent busulfan.

It should be noted that these data presented above are current as of the respective data cut-off dates, are preliminary in nature and our HGB-206 study is not complete. There is limited data concerning long-term safety and efficacy following treatment with our LentiGlobin drug product. These data may not continue for these subjects or be repeated or observed in ongoing or future studies involving our LentiGlobin product candidate in subjects with severe SCD, including this study and our HGB-205 study. It is possible that subjects for whom complications of severe SCD have been reduced or eliminated may experience complications of severe SCD in the future. Furthermore, the LentiGlobin drug product used in the HGB-206 study under the original protocol and presented above did not utilize our refined drug product manufacturing process that is being utilized under the amended protocol for the HGB-206 study.

32.     On March 15, 2018, the Company gave a presentation at the Barclays Global Healthcare Conference 2018, which touted 2017, as a "Breakthrough Year for bluebird", in part based on the Company's "[p]rogressing first filings for EU and US approvals"—*viz.* "transfusion-dependent β-thalassemia products."

33.     On May 2, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2018 (the "Q1'18 10-Q") with the SEC, which contained signed certifications pursuant to SOX by the Individual Defendants, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

34.     The Q1'18 10-Q further touted the Company's HGB-205 study results as forming the basis of its regulatory applications, stating that "[i]f successful, we believe the results from our ongoing Northstar-2 Study, together with data from our Northstar Study and ongoing HGB-205 study, could be sufficient to form the basis for a BLA [(FDA Biologics License Application)] submission for our LentiGlobin product candidate to treat adult and adolescent

patients with TDT and a non-β0/β0 genotype. In addition, if successful, we believe the results from our Northstar-3 Study, together with data from our Northstar Study and ongoing Northstar-2 Study, could be sufficient to form the basis for a BLA supplement submission for our LentiGlobin product candidate to treat patients with TDT and a β0/β0 genotype."

35.     Relatedly, Defendants discussed in the Q1'18 10-Q its path to regulatory approval in the EU, stating in relevant part:

> Based on our discussions with the EMA, we believe that we may be able to seek conditional approval for our LentiGlobin product candidate, with our refined manufacturing process, for the treatment of adult and adolescent subjects with TDT and a non- β0/β0 genotype on the basis of the totality of the clinical data from our ongoing studies with LentiGlobin. ***For efficacy, we believe that the Northstar Study and supportive ongoing HGB-205 study, together with the data available from our ongoing Northstar-2 Study and our long-term follow-up study LTF-303, could support the filing of a marketing authorization application in the European Union***. This plan is contingent upon all of the studies conducted in patients with TDT with the LentiGlobin product candidate demonstrating sufficient efficacy and safety, and in particular, transfusion independence and reduction in transfusion requirements, for efficacy analyses in the Northstar, HGB-205 and Northstar-2 studies.

36.     On June 1, 2018, the Company held a ASCO Data Review Conference Call and provided a webcast presentation. Therein, the Company stated that it anticipated to have three regulatory filings by "[e]nd of 2019," including the "First Filing (2018)" "LentiGlobin TDT".

37.     On June 15, 2018, bluebird conducted an investor webcast summarizing clinical data from the Northstar (HGB-204), Northstar-2 (HGB-207) and HGB-206 clinical studies presented at the 23rd Congress of the European Hematology Association in Stockholm, Sweden. A copy of the presentation was attached as Exhibit 99.1 to a Form 8-K filed that same day.  In the presentation, the Company repeated its assertion that it anticipated to have three regulatory filings by "[e]nd of 2019," including the "First Filing (2018)" "LentiGlobin TDT". The Company also reiterated that HGB-205 was the "Basis of EU filing (with Northstar)."

Additionally, the Company stated that "[t]ransfusion-dependent β-thalassemia (TDT) MAA filing on track for 2018[.]"

38.     In a press release attached as Exhibit 99.2 to the Form 8-K filed with the SEC on June 15, 2018, the Company again touted some its findings in Group A, stating in relevant part:

Group A: Long-term data on 7 patients in the initial study cohort with ≥ 2 years follow-up:

- Steady levels of LentiGlobin vector and HbAT87Q were maintained through 2 years (median follow-up: 24.2 months; range: 22.8-32.9)
- Median transduced CD34+ cells: 25%
- Media DP cell dose: 2.1 x 106 CD34+ cells • Median DP VCN: 0.6
- Median (range) total hemoglobin at last study visit was 9.1 (7.1 - 11.4) g/dL

39.     On August 2, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2018 (the "Q2'18 10-Q") with the SEC, which contained signed certifications pursuant to SOX by the Individual Defendants, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

40.     The Q2'18 10-Q stated that "[i]f successful, we believe the results from our ongoing Northstar-2 Study, together with data from our Northstar Study and ongoing HGB-205 study, could be sufficient to form the basis for a BLA submission for our LentiGlobin product candidate to treat adult and adolescent patients with TDT and a non-β0/β0 genotype. In addition, if successful, we believe the results from our Northstar-3 Study, together with data from our Northstar Study and ongoing Northstar-2 Study, could be sufficient to form the basis for a BLA supplement submission for our LentiGlobin product candidate to treat patients with TDT and a β0/β0 genotype."

41.     Relatedly, Defendants discussed in the Q2'18 10-Q the path to regulatory approval in the EU, stating in relevant part:

Based on our discussions with the EMA, we believe that we may be able to seek conditional approval for our LentiGlobin product candidate, with our refined manufacturing process, for the treatment of adult and adolescent subjects with TDT and a non- $\beta 0/\beta 0$ genotype on the basis of the totality of the clinical data from our ongoing studies with LentiGlobin. ***For efficacy, we believe that the Northstar Study and supportive ongoing HGB-205 study, together with the data available from our ongoing Northstar-2 Study and our long-term follow-up study LTF-303, could support the filing of a marketing authorization application in the European Union***. This plan is contingent upon all of the studies conducted in patients with TDT with the LentiGlobin product candidate demonstrating sufficient efficacy and safety, and in particular, transfusion independence and reduction in transfusion requirements, for efficacy analyses in the Northstar, HGB-205 and Northstar-2 studies.

42.     On September 6, 2018, bluebird presented at the 2018 Wells Fargo Securities Healthcare Conference, where it indicated that "LentiGlobin TDT" would receive "Potential First Approval" in 2019. The presentation further stated that TDT's "MAA [marketing authorization application] filing on track for 2018 – with Accelerated Assessment[.]" Additionally, the Company repeated that its "TDT Registration Strategy" with respect to the EU was to "[p]ursue CONDITIONAL APPROVAL in patients with non-$\beta^0/\beta^0$ genotypes on the basis of data from ongoing Northstar (HGB-204) & HGB-205 studies, as well as available data from Northstar-2 (HGB-207) study." (Emphasis in original).

43.     On October 5, 2018, the Company issued a press release, also attached as Exhibit 99.1 to a Form 8-K filed with the SEC that same day, announcing that the European Medicines Agency (EMA) accepted bluebird'sMAA for LentiGlobin, for the treatment of adolescents and adults with TDT. The press release stated in relevant part:

CAMBRIDGE, Mass. – October 5, 2018 – bluebird bio, Inc. (Nasdaq: BLUE) announced today that the European Medicines Agency (EMA) accepted the company's marketing authorization application (MAA) for its investigational LentiGlobin™ gene therapy for the treatment of adolescents and adults with transfusion-dependent β-thalassemia (TDT) and a non-β0/β0 genotype.

LentiGlobin was previously granted an accelerated assessment by the Committee for Medicinal Products for Human Use (CHMP) of the EMA in July 2018, potentially reducing the EMA's active review time of the MAA from 210 days to 150 days.

"People living with transfusion-dependent β-thalassemia require frequent blood transfusions that are life-saving but may lead to complications, including organ failure due to iron overload," said David Davidson, M.D., chief medical officer, bluebird bio. "***The acceptance of our marketing authorization application for LentiGlobin is a milestone*** that advances us toward our goal of providing to patients the first one-time gene therapy that addresses the underlying genetic cause of TDT. We share this important milestone with the patients, families and healthcare providers who made it possible through their participation in our pioneering clinical studies of LentiGlobin."

***The MAA for LentiGlobin is supported by data from the completed Phase 1/2 Northstar (HGB-204) study and the ongoing Phase 1/2 HGB-205 study*** as well as available data from the Phase 3 Northstar-2 (HGB-207) study and the long-term follow-up study LTF-303.

44.     On November 1, 2018, the Company filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2018 (the "Q3'18 10-Q") with the SEC, which contained signed certifications pursuant to SOX by the Individual Defendants, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

45.     The Q3'18 10-Q stated that "[i]f successful, we believe the results from our ongoing Northstar-2 Study, together with data from our Northstar Study and ongoing HGB-205 study, could be sufficient to form the basis for a BLA submission for our LentiGlobin product candidate to treat adult and adolescent patients with TDT and a non-β0/β0 genotype. In addition, if successful, we believe the results from our Northstar-3 Study, together with data from our Northstar Study and ongoing Northstar-2 Study, could be sufficient to form the basis for a BLA supplement submission for our LentiGlobin product candidate to treat patients with TDT and a β0/β0 genotype."

46.     Relatedly, Defendants discussed in the Q3'18 10-Q its path to regulatory approval in the EU, stating in relevant part:

Bed on our discussions with the EMA, we believe that we may be able to seek conditional approval for our LentiGlobin product candidate, with our refined

manufacturing process, for the treatment of adult and adolescent patients with TDT and a non- β0/β0 genotype on the basis of the totality of the clinical data from our ongoing studies with LentiGlobin. ***For efficacy, we believe that the Northstar Study and supportive ongoing HGB-205 study, together with the data available from our ongoing Northstar-2 Study and our long-term follow-up study LTF-303, could support the filing of a marketing authorization application in the European Union.*** This plan is contingent upon all of the studies conducted in patients with TDT with the LentiGlobin product candidate demonstrating sufficient efficacy and safety, and in particular, transfusion independence and reduction in transfusion requirements, for efficacy analyses in the Northstar, HGB-205 and Northstar-2 studies.

47.     The statements referenced in ¶¶ 23-46 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) LentiGlobin when used to treat severe SCD did not produce as much anti-sickling hemoglobin as previously reported; (ii) accordingly, the Company's LentiGlobin product was not as effective as previously reported; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Begins to Emerge

48.     On Sunday, December 1, 2018, bluebird issued a press release, which was also attached to a Form 8-K filing of the Company dated December 3, 2018, advising investors that it had "announced new long-term data from the completed Phase 1/2 Northstar (HGB-204) study of investigational LentiGlobin™ gene therapy in patients with transfusion-dependent β-thalassemia (TDT) and from the ongoing Phase 1/2 HGB-206 study of LentiGlobin in patients with sickle cell disease (SCD) today at the 60th Annual Meeting of the American Society of Hematology (ASH)."

49.      In particular, the Company's reported results of the Northstar trial cast doubt

on the efficacy of LentiGlobin in increasing the production of anti-sickling hemoglobin:

> Data showed that eight of 10 patients with TDT and a non-$\beta^0/\beta^0$ genotype who
> were treated with LentiGlobin in the Northstar study achieved transfusion
> independence, meaning they had not received a transfusion for at least 12 months
> and maintained hemoglobin >9 g/dL. These eight patients have maintained
> transfusion independence for a median duration of 38 months (21 – 44 months) as
> of September 14, 2018.
>
> Total hemoglobin levels for the eight transfusion-independent non-$\beta^0/\beta^0$ genotype
> patients were stable and ranged from 9.7 – 14.1 g/dL at the last study visit.
> HbA$^{T87Q}$ remained stable in these patients over time, for up to four years as of the
> time of data cut-off.
>
> Three of the eight patients with TDT and a $\beta^0/\beta^0$ genotype who were treated with
> LentiGlobin achieved transfusion independence. Two of these patients had
> follow-up for more than 3.5 years and one had more than two years of follow up.
> All three maintained transfusion independence through their last follow up with
> hemoglobin ranging from 9.1 – 10.9 g/dL.
>
> *      *      *
>
> ***In Group A patients, consistent HbA$^{T87Q}$ production was observed ranging from
> 0.7 – 2.8 g/dL at last visit*** and patients maintained stable total hemoglobin levels
> ranging from 7.6 – 11.8 g/dL at last visit.

(Emphasis added.)

50.      Additionally, the Company filed an investor presentation with the SEC as Exhibit

99.1 to a Form 8-K filing dated December 3, 2018.   Therein the Company provided the

following chart detailing HbA$^{T87Q}$ production in the trial participants:



51.     On December 3, 2018, the following trading day, *Seeking Alpha* published an article noting that these "results were lower than initial data reported a year ago indicating a lower rate of production of anti-sickling hemoglobin."

52.     Following bluebird's announcement of the clinical studies' results, the Company's stock price fell $6.39 per share, or 5.2%, to close at $116.50 per share on December 3, 2018.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

53.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired bluebird securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

54.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, bluebird securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by bluebird or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

55.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

56.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

57.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of bluebird;

- whether the Individual Defendants caused bluebird to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of bluebird securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

58.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

{00304709;1 }

59.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- bluebird  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold bluebird securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

60.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

61.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

62.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

63.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

64.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of bluebird securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire bluebird securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

65.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for bluebird securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about bluebird finances and business prospects.

66.     By virtue of their positions at bluebird , Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended

thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

67.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of bluebird, the Individual Defendants had knowledge of the details of bluebird internal affairs.

68.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of bluebird.  As officers and/or directors of a publicly-held Company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to bluebird businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of bluebird securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning bluebird business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired bluebird securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

69.     During the Class Period, bluebird securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of bluebird securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of bluebird securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of bluebird securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

70.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

71.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

72.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

73.     During the Class Period, the Individual Defendants participated in the operation and management of bluebird, and conducted and participated, directly and indirectly, in the conduct of bluebird business affairs.  Because of their senior positions, they knew the adverse non-public information about bluebird misstatement of income and expenses and false financial statements.

74.     As officers and/or directors of a publicly owned Company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to bluebird financial condition and results of operations, and to correct promptly any public statements issued by bluebird which had become materially false or misleading.

75.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which bluebird disseminated in the marketplace during the Class Period concerning bluebird results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause bluebird to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of bluebird within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of bluebird securities.

76.     Each of the Individual Defendants, therefore, acted as a controlling person of bluebird.  By reason of their senior management positions and/or being directors of bluebird, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, bluebird to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of bluebird and possessed

the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

77.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by bluebird.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  December 12, 2018                              Respectfully submitted,


                                              */s/ Glen DeValerio*_____
                                              Glen DeValerio (BBO #122010)

                                              **ANDREWS DEVALERIO LLP**
                                              265 Franklin Street, Suite 1702
                                              Boston, MA 02110
                                              Telephone: (617) 936-2796
                                              Email: glen@andrewsdevalerio.com

                                              ***Liaison Counsel for the Plaintiff***

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Jonathan Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com
Email: jlindenfeld@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile (212) 697-7296
Email:  peretz@bgandg.com

*Attorneys for Plaintiff*